IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

YONNES S.,                                )
                                          )
                Plaintiff,                )
                                          )
v.                                        )         Civil Action No. 1:20cv0819 (JFA)
                                          )
ANDREW SAUL,                              )
Commissioner of Social Security,          )
                                          )
                Defendant.                )
                                          )

## MEMORANDUM OPINION

This matter is before the court on cross-motions for summary judgment. (Docket nos. 15, 18). Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision of Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for Disability Insurance Benefits ("DIB") under the Social Security Act. The Commissioner's final decision is based on a finding by the Administrative Law Judge ("ALJ") and Appeals Council for the Office of Disability Adjudication and Review ("Appeals Council") that plaintiff was not disabled as defined by the Social Security Act and applicable regulations.[1]

On January 28, 2021, plaintiff filed a motion for summary judgment (Docket no. 15), a memorandum in support (Docket no. 16), and a waiver of hearing (Docket no. 17). Thereafter, the Commissioner submitted a cross-motion for summary judgment (Docket no. 18), a memorandum in support (Docket no. 19), a memorandum in opposition (Docket no. 20), and a

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Docket no. 10). In accordance with those rules, this memorandum opinion excludes any personal identifiers such as plaintiff's social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

waiver of hearing (Docket no. 21). On March 4, 2021, plaintiff filed a reply to the Commissioner's memoranda. (Docket no. 22).

For the reasons set forth below, plaintiff's motion for summary judgment (Docket no. 15) is denied; the Commissioner's motion for summary judgment (Docket no. 18) is granted; and the final decision of the Commissioner is affirmed.

## I. PROCEDURAL BACKGROUND

On February 7, 2019, plaintiff applied for DIB with an alleged onset date of February 4, 2019.[2] (AR 83–84, 157–63). The Social Security Administration ("SSA") initially denied plaintiff's application on June 26, 2019. (AR 96–97). Plaintiff signed an "Appointment of Representative" form on July 18, 2019 authorizing Bruce K. Billman to represent him with respect to his claim. (AR 124). Plaintiff requested reconsideration of the denial on August 26, 2019 (AR 125), which the SSA denied on September 25, 2019 (AR 115–16). On October 9, 2019, plaintiff requested a hearing before an ALJ. (AR 133–34). The Office of Hearings Operations acknowledged receipt of plaintiff's request on October 22, 2019 (AR 135–37) and later scheduled a hearing before an ALJ for March 4, 2020 (AR 60).

On March 4, 2020, ALJ Nicolas R. Foster held a hearing in Richmond, Virginia. (AR 33). Plaintiff appeared in person and was represented by his attorney Bruce Billman. *Id.* A vocational expert participated in the hearing by telephone. *Id.* Plaintiff provided testimony and answered questions posed by his attorney and the vocational expert. (AR 36–55). The vocational expert also answered questions from the ALJ and plaintiff's attorney. (AR 54–58).

---

[2] The disability determination explanations at the initial and reconsideration levels state that plaintiff initially filed his disability claim on February 7, 2019 (AR 83, 100), but the application summary for disability insurance benefits states plaintiff completed his application for social security benefits on April 22, 2019 (AR 157). The ALJ's decision uses the February 7, 2019 date. (AR 15).

On April 17, 2020, the ALJ issued his decision finding that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act from February 4, 2019 through the date of his decision. (AR 15–27). Plaintiff requested review by the Appeals Council and submitted a brief in support of the request for review. (AR 244–54). The Appeals Council denied plaintiff's request for review on June 1, 2020, finding no reason under its rules to review the ALJ's decision. (AR 1–3). As a result, the ALJ's decision became the final decision of the Commissioner. (AR 1). *See* 20 C.F.R. § 404.981. Plaintiff was given sixty (60) days to file a civil action challenging the decision. (AR 2).

On July 21, 2020, plaintiff filed this civil action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (Docket no. 1). On July 23, 2020, the court entered an order setting the briefing schedule for the parties' cross-motions for summary judgment. (Docket no. 4). On November 19, 2020, the Commissioner filed a consent motion for extension of time to file the electronic certified administrative record and answer to plaintiff's complaint (Docket no. 7), which was granted the same day (Docket no. 8). Thereafter, the parties agreed to refer this matter to the undersigned magistrate judge for resolution. (Docket nos. 11, 13). On January 13, 2021, the Commissioner filed a consent motion to alter the briefing schedule, which the court granted on the next day. (Docket nos. 12, 14). Plaintiff filed his motion for summary judgment on January 28, 2021. (Docket no. 15). The Commissioner filed his opposition and cross-motion for summary judgment on February 19, 2021. (Docket nos. 18–20). On March 4, 2021, plaintiff filed a reply to defendant's motion for summary judgment. (Docket no. 22). The parties waived oral argument on their motions. (Docket nos. 17, 21). This case is now before the court on the parties' cross-motions for summary judgment. (Docket nos. 15, 18).

## II. STANDARD OF REVIEW

Under the Social Security Act, the court will affirm the Commissioner's final decision "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1979)). It is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* (internal quotations and citations omitted). In determining whether a decision is supported by substantial evidence, the court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Id.* (alteration in original) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). It is the ALJ's duty to resolve evidentiary conflicts, not the reviewing court, and the ALJ's decision must be sustained if supported by substantial evidence. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

## III. FACTUAL BACKGROUND

### A.      Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1976 and was forty-three years old at the time of the ALJ hearing on March 4, 2020. (AR 37). Plaintiff has three years of college education but did not receive a degree. (AR 37–38). From 1999 to 2013, plaintiff was a member of the U.S Marine Corps and primarily worked in an administrative capacity. (AR 46, 187). From 2013 to February 2019, plaintiff worked at FEMA as a database specialist. (AR 43–45, 54–55, 187).

### B.   Overview of Plaintiff's Medical History[3]

#### i.   *Plaintiff's Wife's Letter*

On February 12, 2020, plaintiff's wife wrote a letter asserting it was impossible for plaintiff to hold a job due to his mental illness. (AR 239). She wrote plaintiff can seem fine and normal, smile, and crack jokes but that he often spends all day in bed, sometimes not eating, not showering for days, isolating himself, ignoring calls from his family, and being emotionally distant with their children. *Id.* She noted plaintiff would often call in sick or take leave without pay to stay in bed and sleep. *Id.* She described plaintiff as having a daily psychological struggle with the demand of going to work every day, aside from the physical pain he endured. *Id.*

#### ii.   *Summary of Plaintiff's Medical History*

As early as 2011, plaintiff reported a two-year history of foot pain and plantar fasciitis with pain in his heels. (AR 266). Plaintiff was noted as having chronic low back pain in April 2012 after he had an acute flare-up; plaintiff had surgery in 2009 which helped deal with pain radiating to his legs, but he still had midline lumbar pain normally at five out of ten that was aggravated by changing positions. (AR 304). Plaintiff has intervertebral disc degeneration disease due to disc tears and bulges, along with myofascial lumbar pain. (AR 1829). While the ALJ found plaintiff's degenerative disc disease to be a severe impairment (AR 17), the issues raised in this appeal are limited to his mental impairments and his ability to perform work on a consistent basis based on his mental impairments. Accordingly, the remainder of this factual background will not address his physical limitations but will focus on his mental health.

---

[3] The AR contains over 1,700 pages of medical records from various sources relating to plaintiff's medical treatments. This summary provides an overview of plaintiff's medical treatments and conditions relevant to his claims and is not intended to be an exhaustive list of every medical treatment.

Plaintiff was noted as having depression as early as April 2013. (AR 328). Plaintiff was admitted to inpatient psychiatric units on three different occasions from 2013 to 2017. (AR 1887–88). The first admission was for five days in June 2013 soon after he left the U.S. Marine Corps. (AR 1887). In October 2013 plaintiff was admitted again for a five-day period. *Id.* The third admission was in May 2017 for five days at the Mary Washington Snowden facility in Fredericksburg. (AR 1888, 1076 –1116). In August 2014, plaintiff started regular mental health treatment appointments through the Department of Veteran Affairs with Dr. Joseph Dolansky, a psychiatrist at the Virginia Medical Center ("VAMC") Community Based Outpatient Clinic ("CBOC") in Fredericksburg, Virginia. (AR 1887). The Administrative Record does not contain any records relating to plaintiff's two inpatient admissions in 2013 and the earliest record from Dr. Dolansky is a September 16, 2017 letter providing a summary of plaintiff's treatment and diagnosis. (AR 1887). The first treatment note in the Administrative Record from Dr. Dolansky is dated April 10, 2018. (AR 1237–43). Dr. Dolansky has diagnosed plaintiff as having major depressive disorder, recurrent with psychotic features. (AR 1905).

## C.   Plaintiff's Medical History Regarding His Mental Health

### i.   *Dr. Dolansky's Letters*

On September 16, 2017, plaintiff's psychiatrist, Dr. Dolansky, wrote a letter stating he had seen plaintiff for regularly scheduled appointments at the VAMC CBOC in Fredericksburg, Virginia for the prior three years. (AR 1887). At that point plaintiff had seen Dr. Dolansky five times and he had seen other staff Veterans Affairs ("VA") psychiatrists prior to and during that time. *Id.* Dr. Dolansky wrote plaintiff has "an extensive psychiatric history" consistent with major depressive disorder, recurrent and with psychotic features. *Id.* Dr. Dolansky reported that on June 11, 2013, plaintiff presented to the McGuire emergency room in Richmond, Virginia

6

with depressive symptoms: reduced sleep, eating one meal per day, reduced energy and concentration, as well as command auditory hallucinations. *Id.* Plaintiff was afraid he would hurt himself or his children. *Id.* Plaintiff had been taking the antidepressant venlafaxine but had run out after being discharged from the U.S. Marine Corps. *Id.* Plaintiff reported feeling stressed and depressed in trying to find employment. *Id.* Plaintiff was discharged from the emergency room but reported back two days later because of his auditory hallucinations and was admitted to the acute inpatient psychiatric unit. *Id.* Plaintiff was discharged five days later, having been prescribed venlafaxine and risperdal (antipsychotic). *Id.* On October 15, 2013, plaintiff experienced strong specific suicidal thoughts, and on October 17, 2013 he was admitted to the acute inpatient psychiatric unit at McGuire Richmond VAMC until October 21, 2013. *Id.*

Dr. Dolansky's letter states that he began seeing plaintiff on August 26, 2014, and he was taking abilify, an antipsychotic, and venlafaxine, an antidepressant. *Id.* Plaintiff had also seen Dr. Javed, another VA psychiatrist. *Id.* At one point, plaintiff had reduced his antidepressant usage and was encouraged to increase it back to the prescribed level. *Id.* Dr. Dolansky states he saw plaintiff on May 19, 2017, following a five-day acute inpatient psychiatric admission at Snowden at Fredericksburg, Virginia (a behavioral health services facility at Mary Washington Hospital). (AR 1888). Plaintiff had been admitted due to hopelessness, despair, worsening depression, "negative" auditory hallucinations, and strong suicidal thoughts. *Id.* Dr. Dolansky indicates that when he saw plaintiff on August 17, 2017 plaintiff had moved back with his wife, quit his job, was taking online classes towards his BA degree and stated plaintiff was more adherent with his psychotropic medications, which were citalopram (antidepressant) and perphenazine (antipsychotic). *Id.* Plaintiff was adherent in attending outpatient psychiatric appointments but had attended only one psychotherapy appointment. *Id.* Dr. Dolansky

7

described plaintiff's major depressive disorder, recurrent with psychotic features, as "moderate to severe." *Id.* Dr. Dolansky concluded that plaintiff had a "chronic and debilitating mental illness characterized by worsening depression, suicidal thoughts, conflicting and contradictory thoughts and auditory hallucinations in the context of a difficult childhood and continued psychosocial stressors." *Id.* Dr. Dolansky's overall prognosis for plaintiff was "fair at best" assuming plaintiff continued with regular and close psychiatric follow up. *Id.* Dr. Dolansky also wrote there were "no restrictions placed on Mr. Sanders' activities." *Id.*

On February 6, 2020, Dr. Dolansky wrote another letter stating that plaintiff saw him for regularly scheduled appointments since August 2014 and that plaintiff had also seen a VA psychologist. (AR 1905). Dr. Dolansky recounted much of the information in his first letter, then stated "[a]t this time, [plaintiff] remains with hopelessness, depressed mood, poor energy/motivation, poor self-esteem, poor concentration, and has daily suicidal thoughts." *Id.* Dr. Dolansky wrote that plaintiff appears to have a chronic and debilitating mental illness characterized by worsening depression, suicidal thoughts, conflicting and contradictory thoughts, and auditory hallucinations in the context of a traumatic and difficult childhood. (AR 1905–06). Dr. Dolansky wrote that plaintiff's overall prognosis continued to be in the poor to fair range and noted that plaintiff was prescribed duloxetine (antidepressant). (AR 1906).

### ii. *Summary of Plaintiff's Recent Mental Health Appointments*

The Administrative Record contains treatment notes from Dr. Dolansky for eleven sessions with the plaintiff beginning on April 10, 2018 and ending on February 4, 2020. In each of those treatment notes there is a section titled Mental Status Exam. A review of all eleven treatment notes reveals the identical information under that heading. To avoid repetition, a summary of plaintiff's mental status exam is provided at the onset and will not be discussed in

8

each of the summaries of plaintiff's eleven sessions with Dr. Dolansky. As indicated by Dr. Dolansky, plaintiff is a young African American who is cooperative, with good eye contact and friendly in session. His speech is organized, with normal prosody with somewhat soft volume. His mood is noted as "ok". His affect is euthymic and appropriate to content. He has organized form of thoughts. Plaintiff denies suicidal and homicidal ideations. Plaintiff is noted as positive for having had auditory hallucinations in the past but not now. Plaintiff is also noted as positive for paranoid delusions. Plaintiff's attention/concentration and insight/judgment are good. (AR 1173–74, 1184, 1189–90, 1195, 1206–07, 1220–21, 1239–40, 1818, 1924–25, 1935, 1955).

On April 10, 2018, plaintiff saw Dr. Dolansky, having just filed an EEO complaint at work and hiring a lawyer, his emotions were "all over the place"; he did not feel productive at work; his wife and children prevented him from acting out in anger which he was adamant he would not do; he felt hurt and stressed; he felt he did not have enough work compared to the administrative work he did at the U.S. Marine Corps. (AR 1239). Plaintiff requested paid leave because he struggled to be at work. *Id.* Plaintiff stated he was afraid he might blow up and used marijuana on occasion including the night before to help him sleep. *Id.* Plaintiff was counseled to continue taking his prescribed medication for depression and psychosis, to discontinue using marijuana, and to attend psychotherapy visits. (AR 1241–42).

On May 29, 2018, plaintiff saw Dr. Dolansky, who noted that plaintiff continued to feel stressed and unproductive at work and is hoping for "FERS retirement." (AR 1220). Plaintiff was taking his prescribed medication for depression and psychosis and indicated they keep him "more level". (AR 1222). Plaintiff was warned of the dangers of using marijuana including worsening paranoia, mood, and cognition. *Id.* Plaintiff saw Dr. Dolansky again on August 28, 2018 and there was little change from his previous visit. (AR 1205-06). Plaintiff was taking his

9

prescribed medication for depression and psychosis and indicated that he would see a therapist at the VA clinic in Alexandria. *Id.*

On November 21, 2018, plaintiff saw Dr. Dolansky and described continued and ongoing frustration, anxiety, stress, and anger issues as he continued to go to work, having to face his boss in the morning, and not having sufficient work to complete. (AR 1194). Plaintiff's EEO complaint was ongoing, but he did not trust the EEOC given the way his lawsuit against his boss was handled. *Id.* Plaintiff was denied paid leave and he tried to avoid his boss and others daily; plaintiff stated that he did not like being around others and his anger was triggered easily. *Id.* Dr. Dolansky noted that plaintiff had a long history of mistrust since his early childhood and had been exposed to physical, emotional, and sexual abuse at a very young age; his mother had been addicted to crack, left plaintiff to care for his younger siblings, and placed plaintiff in shelters, which plaintiff interpreted as rejection. *Id.* Plaintiff stated that about seven to eight years prior he "broke," and his mind "was flooded" with severe anger, and he developed psychotic signs and symptoms. *Id.* Plaintiff had been admitted to inpatient psychiatric units three times since then because of stress, suicidal and homicidal ideations, and worsening psychosis. *Id.* Plaintiff continued to have suicidal and homicidal ideations, including specific homicidal ideations directed at his boss. *Id.* Plaintiff denied any intent related to those ideations. *Id.* Plaintiff stated he only felt relaxed when alone with his children, and he doubted that he really loved his wife. *Id.* Plaintiff used marijuana to calm down, despite Dr. Dolansky having repeatedly told plaintiff that marijuana use increased paranoid ideations. *Id.* Dr. Dolansky told plaintiff that his mistrust was likely the result of his long history of abuse and neglect. *Id.* Plaintiff did not trust the lawyer handling his EEO case, any employees, or anyone outside his immediate family. *Id.*

10

Dr. Dolansky noted that it was "hard to decipher" if plaintiff was currently having auditory hallucinations or something else related to a trauma-related disorder. *Id.* Plaintiff had not been taking his antidepressant because it made him feel like a "zombie," nor had he been taking his antipsychotic. *Id.* Plaintiff did not want to take an antipsychotic but consented to another trial of an antidepressant as he was depressed, hopeless, angry, and irritable; so they discussed plaintiff taking duloxetine. *Id.* Plaintiff stated he wanted psychotherapy but could not schedule it because of work, and again denied that he would hurt himself or others. *Id.* Plaintiff was prescribed medication for depression, anxiety, and psychosis. (AR 1195–97).

On December 13, 2018, plaintiff saw Dr. Dolansky and stated his Federal Employee Retirement System retirement had been approved. (AR 1189). Plaintiff had been a little stressed, stating he needed structure and guidance and that he would be ok but needed marital therapy. *Id.* Plaintiff complained that his wife was "overly miserly" (doctor's notes). *Id.* Plaintiff stated he thought at times of "not being here," which the doctor noted as "passive [suicidal ideations]." *Id.* Plaintiff had no plans to harm himself or others, was still processing recent events, and had not used marijuana in "a long time." *Id.* Dr. Dolansky advised plaintiff to begin marriage counseling to enhance communication and to start duloxetine for depression. *Id.* Plaintiff was prescribed medication for depression, anxiety, and psychosis. (AR 1190–91).

Plaintiff saw Dr. Dolansky on February 7, 2019 (the first visit since his alleged disability date of February 4, 2019), and reported that while at a restaurant in January 2019 he "almost had a complete breakdown." (AR 1183). Plaintiff reported worsening depression, but after three weeks on antidepressants, which gave him nausea, his mood and depression was slowly improving; although plaintiff still had low energy, motivation, and appetite. *Id.* With his FERS retirement having been approved, he stated he did not know what he would do with his life but

11

was considering going back to the gym as he had done in the past. *Id.* Plaintiff stated that he had stopped using marijuana and he was given positive reinforcement by Dr. Dolansky. *Id.* Plaintiff was prescribed medication for depression, anxiety, and psychosis. (AR 1184–86).

On April 5, 2019, plaintiff saw Dr. Dolansky and admitted that he had stopped taking his medications for a week and half and "lost control of his thoughts." (AR 1173). Plaintiff stated that he did not like to take his psychiatric medication and he tended to discontinue them when he felt better. *Id.* Dr. Dolansky stated that plaintiff's depression appeared to be slowly resolving but he noted that plaintiff had restarted using marijuana. *Id.* Plaintiff was prescribed medication for depression, anxiety, and psychosis. *Id.* Dr. Dolansky discussed the need for plaintiff to be adherent to his medications and plaintiff was warned of the dangers of chronic marijuana use including worsening paranoia, mood, and cognition. (AR 1173, 1175).

On July 12, 2019, plaintiff saw Dr. Dolansky stating his mood had been better over the past month, and that he had been taking his antidepressant (restarting his Citalopram because he had been feeling depressed partially because of marital issues). (AR 1817). Plaintiff was staying busy with his children, their sports camps, and errands. *Id.* Dr. Dolansky suggested yoga to assist with plaintiff's stress and marital therapy for the dissatisfaction with his marriage. *Id.* Plaintiff was prescribed medication for depression and psychosis and was cautioned concerning the dangers of chronic use of marijuana. (AR 1819).

On September 10, 2019, plaintiff saw Dr. Dolansky reporting that he was taking his antidepressant (duloxetine) daily, but only at a low dose and he did not want to increase the dose. (AR 1954). Plaintiff stated the duloxetine helped with his mood. *Id.* Plaintiff attributed his mood to dissatisfaction in his marriage and was advised marital therapy. *Id.* Plaintiff also stated that he wants to work on reducing his chronic pain so he could have a better quality of life. *Id.*

Plaintiff was prescribed medication for anxiety, depression, and psychosis and declined Dr. Dolansky's advice to increase the dose of duloxetine.  (AR 1955–56).

On November 15, 2019, plaintiff saw Dr. Dolansky reporting he tried to be positive but struggled with depressed mood, which plaintiff stated would last a few days to a week at times. (AR 1935).  Plaintiff was prescribed medication for depression, anxiety, and psychosis.  (AR 1936–37).  Plaintiff's duloxetine dosage was increased because of "increased depressed episodes."  (AR 1937).

On February 4, 2020, plaintiff saw Dr. Dolansky, who noted that plaintiff continued to be extremely anxious and was stressed with his upcoming social security hearing.  (AR 1923).  Dr. Dolansky noted that although plaintiff had a calm demeanor, he reported that his mind was always "going."  (AR 1924).  Plaintiff reported that he felt depressed every day and had sleep issues, and that he did not feel he would have a long life because he would not be able to handle the anxiety and depression.  *Id.*  Plaintiff struggled daily with suicidal thinking and reported constant physical pain with throbbing feet pain and back pain issues.  *Id.*  Plaintiff admitted to evening marijuana use to "assist in quieti[n]g down his mind," and stated he was adherent with duloxetine.  *Id.*  Although admitting to suicidal thoughts, thoughts to self-harm, and hopelessness, plaintiff denied any plans to harm himself.  *Id.*  Plaintiff was prescribed medication for depression, anxiety, and psychosis.  (AR 1925–26).

### D.     The ALJ's Decision on April 17, 2020

The ALJ concluded that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act based on his application for DIB for the period February 4, 2019 through the date of the decision, April 17, 2020.  (AR 26–27).  When determining whether an individual is eligible for DIB, the ALJ is required to follow a five-step sequential evaluation.  It is this process

13

the court examines to determine whether the correct legal standards were applied and whether the ALJ's final decision is supported by substantial evidence. *See* 20 C.F.R. § 404.1520(a).

Specifically, the ALJ must consider whether a claimant: (1) is currently engaged in substantial gainful employment; (2) has a severe impairment; (3) has an impairment that meets or equals any of the impairments listed in Appendix 1, Subpart P of the regulations that are considered *per se* disabling; (4) has the ability to perform past relevant work; and (5) if unable to return to past relevant work, whether the claimant can perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(a). For the first four steps of this analysis, the claimant bears the burden to prove disability. *See* 20 C.F.R. § 404.1560(c)(2). The burden then shifts to the Commissioner at step five. 20 C.F.R. § 404.1560(c)(2). When considering a claim for DIB, the Commissioner must determine whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. *See* 42 U.S.C. §§ 416(i), 423. (AR 17). The regulations promulgated by the Social Security Administration also provide that all relevant evidence will be considered in determining whether a claimant has a disability. *See* 20 C.F.R. § 404.1520(a)(3).

Here, the ALJ made the following findings of fact:

(1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2023;

(2) The claimant has not engaged in substantial gainful activity since February 4, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*);

(3) The claimant has the following severe impairments: degenerative disc disease, depression, post-traumatic stress disorder, a history of schizophrenia and a substance abuse disorder (20 CFR 404.1520(c));

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526);

14

(5) [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can only occasionally use ramps and stairs. He can only occasionally balance, stoop, kneel, crouch, and crawl. He is never to be required to use ropes, ladders, or scaffolds. He can understand, remember and carry out simple instructions and can make simple work related decisions. He can work at a consistent pace throughout the workday, but not at a production rate pace where tasks must be performed quickly. He can tolerate occasional interaction with coworkers and supervisors, but must be allowed to avoid contact with the public and tandem work tasks. He can tolerate occasional changes in routine work settings and procedures or processes. He is limited to positions that require very little independent decision making with no responsibility for the safety of others. Finally, he is never to be exposed to hazards including unprotected heights and moving mechanical parts.

(6) The claimant is unable to perform any past relevant work (20 CFR 404.1565).

(7) The claimant was born in 1976 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

(8) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR 404, Subpart P, Appendix 2).

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

(11) The claimant has not been under a disability, as defined in the Social Security Act, from February 4, 2019, through the date of this decision (20 CFR 404.1520(g)).

(AR 17–26).

## IV. ANALYSIS

### A.  Overview

Plaintiff asserts three main arguments in support of his motion for summary judgment: 1) the Commissioner's final decision is unsupported by substantial evidence because the ALJ did not consider plaintiff's one hundred percent disability rating by the Department of Veterans

Affairs; 2) substantial evidence does not support the Commissioner's final decision because the uncontradicted evidence shows plaintiff is unable to sustain work on a regular and continuing basis without disabling degrees of absenteeism and plaintiff is unable to respond appropriately to supervision; and 3) the Commissioner's final decision that plaintiff does not meet the requirements of any listed medical impairment is unsupported by substantial evidence because the ALJ's paragraph B criteria analysis "fails to assess the extent to which [plaintiff] engages in any activity and obscure[s] by inclusion of an overwhelming number of activities which have no relevance or materiality to the area of function that is ostensibly being assessed." (Docket no. 16 at 3, 7–20).

For the reasons discussed below, the undersigned finds that 1) the ALJ was not required to defer to or give any specific evidentiary weight to the VA's disability determination and the ALJ properly considered the medical evidence in the Administrative Record relating to plaintiff's mental health treatments; 2) substantial evidence supports the ALJ's determination that plaintiff could sustain work on a regular and continuing basis and could respond appropriately to supervision; and 3) substantial evidence supports the ALJ's determination at step 3 that plaintiff's mental impairments do not meet the requirements of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, Sections 12.03 (schizophrenia spectrum), 12.04 (depressive, bipolar, and related disorders), or 12.15 (trauma and stressor-related disorders).

### B.    The Department of Veteran Affairs' Disability Rating for Plaintiff

#### i.    Plaintiff's Argument

Plaintiff contends the ALJ was required to consider, if not give substantial weight to, his 100% disability rating from the VA (AR 154). (Docket no. 16 at 7–9 (citing *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 343 (4th Cir. 2012))). Plaintiff acknowledges the SSA changed

16

its regulations in March 2017, no longer giving deference or specific evidentiary weight to medical opinions or prior administrative medical findings. *Id.* at 8. However, plaintiff asserts this is contrary to *Bird,* and SSA regulations still require the Commissioner to consider prior administrative determinations and articulate how they were considered. *Id.* Plaintiff asserts the ALJ's failure to do this rendered his decision unsupported by substantial evidence. *Id.* at 9.

    *ii.*  *The Commissioner's Argument*

   The Commissioner argues current SSA regulations direct ALJs not to analyze a decision by other governmental agencies regarding a claimant's disability, employability, or entitlement to any benefits. (Docket no. 19 at 2, 15–16 (citing 20 C.F.R. §§ 404.1504, 404.1520b(c)(1))). The Commissioner asserts *Bird* analyzed prior SSA regulations and is not applicable to plaintiff's claim because plaintiff filed his claim after March 27, 2017, when the new regulations went into effect. *Id.* at 14–17. The Commissioner states that the ALJ did comply with the applicable regulations in that he discussed and considered the relevant medical evidence in the Administrative Record concerning plaintiff's mental health treatments. *Id.* at 16. The Commissioner rejects plaintiff's reliance on 20 C.F.R. § 1520c because it establishes the framework applicable to medical opinions, which are statements from medical sources regarding a claimant's functional abilities despite his impairments, and the restrictions caused by their functional impairments. *Id.* at 17. The Commissioner then asserts the VA's disability rating is not a medical opinion because it contains no such statements. *Id.* at 17–18.

    *iii.*  *The ALJ Was Not Required to Provide an Analysis of Plaintiff's Disability*
       *Rating from the Department of Veteran Affairs*

   20 C.F.R. § 404.1504 explicitly names the VA, among others, in directing ALJs not to analyze any other government agency's determination regarding a claimant's disability, employability, or entitlement to benefits for claims filed after March 27, 2017. This regulation

17

does require the ALJ to consider the supporting evidence underlying any other agency's decision that is contained in the Administrative Record in accordance with 20 C.F.R. § 404.1513(a)(1) through (4).  A review of the ALJ's decision reveals that he did consider the underlying medical records in the Administrative Record concerning plaintiff's treatments while serving with the Marines prior to the disability determination.  The ALJ refers to plaintiff's history of depression, post-traumatic stress disorder, and schizophrenia and cites to plaintiff's extensive service and medical records in exhibits 1F–6F.  (AR 21).  While most of the medical records prior to plaintiff's separation from the Marines in April 2013 are related to treatments for his degenerative disc disease and other non-mental health issues, the ALJ did refer to and discuss the records and plaintiff's mental health diagnoses prior to the disability determination in 2013.[4]

Plaintiff cites 20 C.F.R. § 404.1520c in support of his argument that the ALJ failed to properly consider the VA's disability determination.  (Docket no. 16 at 8).  This regulation applies to "medical opinions and prior administrative findings."  Under 20 C.F.R. § 404.1513(a)(2) "[a] medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions."  A prior administrative medical finding is "a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review in your current claim."  20 C.F.R. § 404.1513(a)(5).  The VA's disability rating is not a medical opinion or a prior administrative finding under the applicable regulations.  Plaintiff has only cited to a

---

[4] Plaintiff was discharged from the Marines effective April 20, 2013 (AR 1155) and two months later he was admitted to an inpatient psychiatric unit indicating he had been stressed and depressed regarding finding employment after leaving the Marines (AR 1887).  Plaintiff started working at FEMA in June 2013 and worked there until February 2, 2019.  (AR 187, 1153).

summary of his VA disability benefits (AR 154) and has not referred to any discussion of his specific impairments by the VA entitling him to disability benefits, nor has he identified any underlying records in the Administrative Record that he believes the ALJ failed to consider. The Commissioner was not required to provide an analysis of the VA's disability decision, nor is there any associated medical opinion from the VA in the Administrative Record.

The *Bird* court relied on Social Security Ruling No. 06-03p requiring ALJs to consider decisions by other agencies. 699 F.3d at 343.[5] That Ruling was rescinded effective March 27, 2017.[6] The decision in *Bird* was based on a Ruling that has now been rescinded and is inconsistent with current SSA regulations. Thus, the *Bird* holding is inapplicable to claims filed after March 27, 2017, including plaintiff's which was filed on February 7, 2019. *See Holmes v. Berryhill*, 2018 WL 3421598, at *14 n.6 (E.D. Va. June 6, 2018).

For these reasons, the court finds that the ALJ complied with the applicable SSA regulations concerning plaintiff's disability rating from the VA.

### C.    Dr. McClain's Medical Opinion

#### i.    *Plaintiff's Argument*

Plaintiff asserts the ALJ failed to address "two opinions by State Agency reviewing psychologist, Jo McClain, Psy.D." that were "outcome-determinative."[7]  (Docket no. 16 at 9).

---

[5] "Under the principles governing SSA disability determinations, another agency's disability determination 'cannot be ignored and must be considered.'" *Bird*, 699 F.3d at 343 (quoting SSR No. 06-03p).

[6] Notice of Rescission of Social Security Rulings, 82 Fed. Reg. 15263 ("adjudicators will not provide any articulation about their consideration of decisions from other governmental agencies . . . because this evidence is neither valuable nor persuasive to us").

[7] Dr. McClain only provided one opinion; it was at the reconsideration stage of plaintiff's disability claim in which she concurred with the prior state agency psychologist's findings regarding the limiting effects of plaintiff's mental impairments but noted improvements based on subjective reports and objective findings with medication compliance. (AR 108–09, 112–14).

Plaintiff admits the ALJ addressed portions of Dr. McClain's opinion and factored those into his residual functional capacity determination but argues that the ALJ erred when he completely omitted any consideration of two additional opinions. *Id.* at 9–10. Plaintiff also argues the ALJ failed to identify evidence that supports his conclusion regarding plaintiff's mental functional limitations and failed to "build an accurate and logical bridge" from that evidence to his conclusions. *Id.* at 10 (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)).

The first opinion plaintiff contends was ignored by the ALJ concerns Dr. McClain's assessment that plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors is moderately limited. *Id.* (citing AR 113). Plaintiff contends this is a functional limitation the ALJ should have addressed in his residual functional capacity determination and in the hypothetical to the vocational expert. *Id.* at 10–11. Plaintiff argues the ALJ failed to ask the vocational expert questions that ensured she was aware of all of plaintiff's abilities and limitations concerning accepting instructions and responding to criticism.[8] *Id.* at 12. Plaintiff contends that the vocational expert's testimony that plaintiff would be precluded from employment if he would react violently or refuse to comply with directives from his supervisor is outcome determinative based on Dr. McClain's assessment that plaintiff is moderately limited in accepting instructions and responding appropriately to criticism.

The second issue plaintiff raises in this portion of his memorandum is Dr. McClain's statement that plaintiff would "be able to maintain attendance and punctuality with only 1–2 problems per month." *Id.* at 13 (citing AR 113). Plaintiff focuses on Dr. McClain's statement that he would have "1–2 problems per month" along with his testimony and leave records in

---

[8] Plaintiff notes his attorney attempted to remedy the ALJ's failure regarding the vocational expert but was "moderately hamstrung" by the lack of a precise definition of a "moderate." (Docket no. 16 at 12).

2018 and argues that the vocational expert's testimony that employment would be precluded by more than one unscheduled absence per month unequivocally establishes he would be incapable of any substantial gainful activity. *Id.*

ii.     *The Commissioner's Argument and Plaintiff's Reply*

The Commissioner contends ALJs no longer "assign weight" to opinions for claims filed after March 27, 2017. (Docket no. 19 at 18). Instead, under 20 C.F.R. § 404.1520c, ALJs consider the persuasiveness of each medical opinion based on the opinion's supportability and consistency. *Id.* The Commissioner asserts the new regulations alter how ALJs discuss medical opinions in their decision: ALJs only need to consider the relevant factors, not explain how they considered them; and in articulating their findings regarding an opinion's persuasiveness, ALJs only need to explain how they considered the supportability and consistency of the opinion. *Id.*

The Commissioner argues the ALJ adopted the narrative portions of Dr. McClain's opinion, explaining what she meant by her "moderate" impairment ratings, in limiting plaintiff to work that required only occasional interaction with the coworkers and supervisors and in which plaintiff would be allowed to avoid contact with the public and tandem work tasks. *Id.* at 19–20. The Commissioner asserts those limitations were presented to the vocational expert, who testified that even with those limitations, in addition to others, a significant number of jobs existed in the national economy. *Id.* The Commissioner also asserts the ALJ was not required to accept vocational expert testimony based on hypotheticals that contain limitations ultimately not adopted by the ALJ and that plaintiff's counsel's hypotheticals to the vocational expert did not accurately reflect limitations supported by the record. *Id.* at 21.

Next, the Commissioner argues Dr. McClain opined that plaintiff would have only one to two *problems* per month with maintaining *attendance and punctuality*, not that plaintiff would

have two or more unscheduled absences per month, pointing out that a problem with attendance or punctuality does not equate to an unscheduled absence. *Id.* at 22. The Commissioner asserts Dr. McClain opined that despite these one to two problems a month, plaintiff would be able to complete a normal work week and perform at a consistent pace, "with only a minimal need for accommodations on an infrequent basis." *Id.* The Commissioner rejects plaintiff's reliance on his leave records as "speculative and contrary to the record," noting plaintiff told Dr. Dolansky he did not have enough work to keep busy and "requested paid leave as it is a struggle to be there with little to no work." *Id.* at 22–23 (citing AR 1194, 1220, 1239).

In his reply, plaintiff rejects the Commissioner's assertion that he took leave from work because he was "bored," "[plaintiff would not] ironically want more time to be idle because of a lack of work." (Docket no. 22 at 4). Plaintiff asserts no evidence exists that he would rather have been doing something else. *Id.* Plaintiff contends being frustrated in part because of a lack of work is not evidence that plaintiff's absences were due to something other than his mental health. *Id.* at 3–4. Citing notes from his sessions with Dr. Dolansky, plaintiff asserts his mental ailments, including his emotions being "all over the place" and fear of "blow[ing] up," were the reasons he took leave. *Id.* Plaintiff also argues Dr. McClain's opinion that plaintiff would have one to two problems per month with attendance and punctuality does not mean he would not have more than one unscheduled absence a month. *Id.* at 5 ("unless the Commissioner has some special insight about the meaning of 'problems with attendance and punctuality' versus . . . absences. . ."). Plaintiff asserts the ability to complete a workweek and work at a consistent pace is a separate issue from his ability to maintain regular attendance. *Id.* at 6.

Plaintiff's reply also argues that the Commissioner admits that plaintiff has a relevant and material (*i.e.* moderate) limitation with his ability to accept instructions and respond

appropriately to criticism from supervisors. *Id.* at 7. While limiting the number of those interactions may reduce the opportunity for issues to arise, plaintiff argues it fails to address the real nature of his alleged inability to accept and respond appropriately to criticism. *Id.*

iii.    *Residual Functional Capacity Medical Opinion Legal Standard*

Residual functional capacity is "the most [the claimant] can still do despite [his] limitations" based on "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 404.1545(a)(3). For claims filed on or after March 27, 2017, the ALJ does not defer or assign any specific evidentiary weight to medical opinions. 20 C.F.R. § 404.1520c(a). The ALJ is required to articulate how persuasive he finds all the medical opinions, but he need not articulate how he considered each medical opinion individually. 20 C.F.R. § 404.1520c(b)–(b)(1). The ALJ must also explain how he considered the supportability and consistency of medical opinions. 20 C.F.R. § 404.1520c(b)(2).

iv.    ***Substantial Evidence Fully Supports the ALJ's Determinations Regarding Plaintiff's Ability to Interact with Supervisors and Attend Work and any Error in his Articulation of the Persuasiveness of Two Portions of Dr. McClain's Opinion in the Residual Functional Capacity Analysis Was Harmless***

a.    *Accept Instructions and Criticism from Supervisors*

Based on her review of plaintiff's medical records, Dr. McClain rated plaintiff's social interaction limitations. (AR 113). As pointed out by the plaintiff, Dr. McClain rated plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors as moderately limited. *Id.* She also rated plaintiff as having a moderate limitation in his ability to interact appropriately with the general public. *Id.* She indicated that plaintiff was not significantly limited in his ability to ask simple questions or request assistance; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; or maintain

23

socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  *Id.*
In explaining the moderate ratings given for plaintiff's social interaction capacities and/or
limitations, she explicitly stated that plaintiff "would be able to interact with the public and
supervisors for brief periods or infrequently."  *Id.*

While the ALJ does not specifically address Dr. McClain's rating of plaintiff's ability to
interact with supervisors, he does address plaintiff's ability to interact with others, noting he lives
with his wife and two children, he drives his children to various locations, shops in stores, and
the medical records consistently show he is alert, oriented, cooperative, friendly, with good eye
contact, attention, concentration, insight, and judgment.  (AR 19, 21–25).  The ALJ cites to the
reconsideration decision from Dr. McClain and discusses how, after reviewing the record as a
whole, he finds certain of the findings to be persuasive, some to be only partly persuasive, and
others not to be persuasive.  (AR 24–25).  Based on his review and discussion of the state agency
consultants' opinions, Dr. Dolansky's opinion and records, and plaintiff's testimony to the extent
it was found supported and persuasive, he included limitations in the residual functional capacity
that plaintiff can understand, remember, and carry out simple instructions; he can tolerate
occasional changes in routine work settings and procedures or processes; and can tolerate
occasional interaction with coworkers and supervisors.  (AR 20–25).  According to Webster's II
New Riverside University Dictionary, the first definition of "occasional" is "occurring from time
to time: infrequent," and the fifth definition is "[a]cting in a specified capacity on an irregular or
infrequent basis."  WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 812 (1984).

A review of the record reveals plaintiff's argument regarding Dr. McClain's rating as to
his ability to interact with supervisors is misplaced.  Far from having "ignored or swept aside" or
"bypass[ed] it entirely" (Docket no. 16 at 10–11), the ALJ adopted Dr. McClain's assessment of

24

plaintiff's ability to interact with supervisors, as explained in her narrative description.  Given

that plaintiff is arguing Dr. McClain's opinion on this point should have received more

consideration and been relied on by the ALJ, and the ALJ adopted Dr. McClain's opinion on this

point (or came to the exact same determination as to the level of impairment on his own); any

error in failing to specifically articulate his consideration in more detail was harmless.[9]

      Plaintiff's next argument that the ALJ did not ensure the vocational expert was aware of

all his limitations, apparently referring to Dr. McClain's rating that plaintiff was moderately

impaired in his ability to accept instructions and respond appropriately to criticism from

supervisors, is also misplaced.  Plaintiff claims he lacked a precise definition of "moderate"

impairment, but Dr. McClain provided an explanation of her moderate limitation in her report by

stating plaintiff would be able to interact with supervisors only for brief periods or infrequently.

(AR 113).  The ALJ's hypothetical posed to the vocational expert included the limitation of

could tolerate occasional interaction with supervisors which is consistent with Dr. McClain's

limitation.  (AR 55).

      Plaintiff argues in his reply that while limiting the number of interactions with a

supervisor may reduce the opportunity for something to go wrong, it fails to address "the nature

and severity" of his ability to accept and respond appropriately to criticism.  (Docket no. 22 at 7).

In support of this argument he cites to portions of Dr. Dolansky's notes referring to plaintiff

---

[9] Erring by not addressing the persuasiveness of a part of a medical opinion is harmless if
the ALJ adopted that part of that opinion.  "[C]ourts have applied the harmless error analysis. . .
[where] remand 'would merely be a waste of time and money.'" *Huddleston v. Astrue*, 826
F.Supp. 2d 942, 955 (S.D. W.Va. 2011) (citing *Jenkins v. Astrue*, 2009 WL 1010870 at *4
(D.Kan. Apr. 14, 2009).  "Remand of a procedurally deficient decision is not necessary [unless
the plaintiff was] 'prejudiced on the merits or deprived of substantial rights.'" *Id.* (quoting
*Connor v. United States Civil Service Commission*, 721 F.2d 1054, 1056 (6th Cir. 1983); *see also
Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (Hall, J., concurring) (finding the ALJ's
initial error harmless because he would have reached the same result regardless of the error).

being "prone to blow up or act out of anger." *Id.* at 8.  This argument fails because there is no indication that plaintiff is "prone" to blow up or act out of anger.  While plaintiff notes his concern about doing so, the records consistently show that he has not "blown up" or acted out in anger toward a supervisor (or anyone else) and that he has no intention of doing so.  (AR 1220, 1239).  In fact, plaintiff states that while he tries to avoid "authority figures" including police and bosses, he does not have a problem with them and that he has never been laid off or fired from a job because of problems getting along with other people.  (AR 214).  Nothing in Dr. McClain's opinion (or the Administrative Record as a whole) suggests that plaintiff would harm a supervisor or refuse to comply with a supervisor's instructions as suggested by plaintiff's counsel in the hypotheticals posed to the vocational expert.  In fact, plaintiff is consistently noted as being cooperative, friendly, with good insight and judgment, and able to maintain socially appropriate behavior.

### b. Ability to Meet Attendance Standards

In rating plaintiff's sustained concentration and persistence limitations, Dr. McClain indicated that plaintiff would be moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual.  (AR 112).  In explaining these limitations in narrative form, Dr. McClain opined that plaintiff "would be able to maintain attendance and punctuality with only 1–2 problems per month."  (AR 113).  During the hearing the ALJ asked the vocational expert if there would "be any full-time competitive unskilled work available to an individual missing on average two or more days of work per month?"  (AR 56). The vocational expert stated only one unscheduled absence per month would be tolerated.  *Id.* Based on this exchange, it is clear that the ALJ was aware that the vocational expert believed that more than one unscheduled absence per month would preclude employment for plaintiff.

The ALJ noted plaintiff's assertion that sometimes he felt that he could not get up and go to work because his mind could not get his body to move,[10] but the ALJ stated that allegation was "not consistent with the claimant's daily activities" and the objective medical evidence. (AR 23). The ALJ found plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms not consistent with his daily activities such as taking care of and transporting his young children, running errands, paying bills, and shopping. (AR 19, 22–23). The ALJ found plaintiff's level of activity not "congruent" with his allegations regarding his mental illness, lessening the persuasiveness of plaintiff's subjective complaints. (AR 23). The ALJ found that while plaintiff has some mental impairments, the plaintiff's testimony and claims concerning the extent of his limitations "was not persuasive, and the objective evidence does not support, the extent of his alleged mental symptoms." (AR 25).

Regarding, plaintiff's leave record, the ALJ is not required to refer to every piece of evidence in his decision. *See Reid v. Comm'r of Soc. Sec. Admin.*, 769 F.3d 861, 865 (4th Cir. 2014). This leave record was discussed in the hearing before the ALJ. (AR 39–40). Plaintiff refers to this leave record as "corroborative" evidence, but Dr. McClain did not state that plaintiff would have more than one unscheduled absence per month. Plaintiff's leave records show he took a substantial amount of both sick and annual leave, missing on average more than one day per month. (AR 173). On April 10, 2018, plaintiff told Dr. Dolansky that he was

---

[10] Plaintiff made this statement at the hearing before the ALJ in clear reference to his mental illness. (AR 46). After stating his mind could not get his body to move and being asked why he felt that way, plaintiff responded: "Honestly, I'm still in therapy to try to figure that out." *Id.* The discussion then turned to his medication, and when asked "Will you get up . . . every day when you're on your meds?" plaintiff responded: "No. Some days I still feel bad. . . Just kind of like hopelessness." (AR 47–48). The ALJ also specifically referenced plaintiff's feeling of hopelessness, even when plaintiff was on his medications and similarly found the alleged persistence, intensity, and limiting effects of it inconsistent with plaintiff's daily activities and the objective medical evidence. (AR 23–24).

stressed at work and did not feel productive there.  (AR 1239).  Plaintiff also stated that he was

hurt and stressed, that he did not have enough work, and that he had done administrative work in

the Marines and was very busy unlike his work at FEMA.  *Id.*  Plaintiff stated he requested paid

leave because it was a struggle to be at work.  *Id.*  At his appointment on May 29, 2018, Dr.

Dolansky noted that plaintiff had requested paid leave because it was a struggle for plaintiff to be

there with little to no work, after plaintiff again described his lack of work.  (AR 1220).  On

November 21, 2018, plaintiff told Dr. Dolansky he was frustrated, anxious, stressed, and angry in

part because he did not have sufficient work to complete.  (AR 1194).

The leave record reveals that plaintiff took 18 hours of annual leave and 12 hours of sick

leave from May 14 to May 27, 2018, immediately prior to when he told Dr. Dolansky that he

struggled to be at work with little to no work to do.  (AR 173).  And for the period immediately

following his November 21 appointment (November 26, 2018 to December 9, 2018), when

plaintiff was upset that he did not have sufficient work to complete, plaintiff took 16 hours of

both annual and sick leave.  *Id.*  Plaintiff took more leave during those two periods than any

other.  *Id.*  The leave records also show that for 9 of the 26 two-week pay periods, plaintiff did

not take any annual or sick leave.  *Id.*  That evidence suggests plaintiff's leave was the result of

specific problems he was having at that time and were not consistent.  The ALJ stated that he

considered the entire record, "absent evidence to the contrary, we take [him] at [his] word."

*Reid,* 769 F.3d at 865 (citing *Hackett v. Barnhart,* 395 F.3d 1168, 1175 (10th Cir. 2005).[11]

---

[11] In addition, there is no indication in the leave records how many instances of
"unscheduled" leave occurred during any specific period.  Taking leave to attend doctors'
appointments, physical therapy, other medical appointments, or vacation would not necessarily
be "unscheduled" leave.  As shown in the leave record, plaintiff was entitled to 254 hours of
annual and sick leave each year, which translates to more than 31 days.  Averaging his allowed
leave of 31 days over a 12-month period would result in approximately 2.5 days a month.

The ALJ is required to articulate how persuasive he finds all the medical opinions but the ALJ need not articulate how he considered each medical opinion individually. 20 C.F.R. § 404.1520c(b)–(b)(1). The ALJ addressed the state agency psychologists' opinions in detail, first finding them not fully supported by the record regarding plaintiff's limitations in understanding, remembering, and applying information, as well as in plaintiff's ability to adapt and manage himself; therefore concluding the opinions were only partly persuasive. (AR 24).

In the concentrating, persisting, or maintaining pace category, the ALJ found the opinions that plaintiff could carry out short and simple instructions persuasive, but not their opinions that plaintiff could carry out detailed instructions. (AR 24). Also in this category, the ALJ found persuasive their opinions that plaintiff could sustain an ordinary routine without special supervision, make simple work-related decisions, and work in coordination with others without being distracted by them. *Id.* In his residual functional capacity *analysis*, the ALJ addressed the persuasiveness of their medical opinions in this category regarding all the specific subcategories *where the psychologists found plaintiff not limited.* (AR 112–13). In his residual functional capacity *determination*, the ALJ adopted the psychologists' limitations regarding the subcategories *where they found plaintiff moderately limited*, finding plaintiff could work at a consistent pace throughout the workday, but not at a production rate pace where tasks must be performed quickly. (AR 20). Dr. McClain found plaintiff could perform at a generally consistent pace with others with only minimal need for accommodations on an infrequent basis. (AR 113). The ALJ's determination of the persuasiveness regarding the subcategory at issue here (plaintiff's ability to perform activities within a schedule, maintain regular attendance, and be punctual) is obvious—the ALJ adopted their limitation. The ALJ addressed plaintiff's claim that he felt like he could not get up and go to work because his mind could not get his body to

29

move but found that those allegations to be inconsistent with plaintiff's daily activities and the objective medical evidence. (AR 23). Having elicited testimony from the vocational expert concerning unscheduled absences (AR 56) following the plaintiff's testimony concerning his taking leave and difficulty going to work (AR 39–40, 46–47), discussing the persuasiveness of the state agency consultants' opinions (AR 24–25), and determining that plaintiff was not persuasive and the objective testimony did not support the extent of his alleged mental symptoms (AR 25), the ALJ did not accept plaintiff's argument that he would be precluded from work based on more than one unscheduled absence per month.

Without a medical opinion or other persuasive evidence showing plaintiff would have more than one unscheduled absence per month as a result of his mental health issues, the ALJ did not need to further address this issue and substantial evidence supported his determination that plaintiff was not precluded from full time employment based on attendance. Even if the ALJ erred in not addressing that subcategory with even greater specificity, his error was harmless.

### D. Paragraph B Criteria

#### i. Plaintiff's Argument

Citing 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A, § 12.00(F)(3)(d), plaintiff asserts the ALJ is required to assess the degree of limitation regarding a claimant's mental functioning by determining the extent to which plaintiff can engage in the paragraph B criteria independently, appropriately, effectively, and on a sustained basis."[12] (Docket no. 16 at 14 n.5).

_____

[12] Plaintiff also cites *Brown v. Commissioner* and *Woods v. Berryhill* in asserting the ALJ must consider not just the type of activities a claimant can perform but also the extent to which the claimant can perform them. 873 F.3d 251, 263 (4th Cir. 2017); 888 F.3d 686, 695 (4th Cir. 2018). Plaintiff does not appear to be challenging the ALJ's analysis of the extent of plaintiff's impairments in the residual functional capacity analysis, instead only citing the cases to assert the ALJ must analyze the degree of impairment at the earlier step according to the paragraph B criteria. (Docket no. 16 at 14–15).

Plaintiff also asserts substantial evidence does not support the ALJ's determination that plaintiff was only moderately impaired in any of the paragraph B criteria because the ALJ merely listed largely irrelevant activities plaintiff had reported at some point in the record. *Id.* at 15–18. Plaintiff asserts the itemized activities do not assist in determining plaintiff's impairment level or explain how the ALJ determined the area of function was impaired to a "moderate" as opposed to "mild" or "marked" degree. *Id.* Plaintiff asserts the ALJ should have explained the extent to which plaintiff engaged in the activity, and how he differentiated between the degrees of impairment, in the context of independence, appropriateness, effectiveness or sustainability. *Id.*

  ii.    *The Commissioner's Argument and Plaintiff's Reply*

The Commissioner argues plaintiff has the burden at this stage of the ALJ's evaluation, noting that a claimant has a "marked" or "extreme" limitation when they are "seriously limited" or "unable" to function independently, appropriately, effectively and on a sustained basis. (Docket no. 19 at 24). The Commissioner asserts the activities the ALJ referred to regarding each of the four areas of limitation were relevant in light of "common sense" and the record. *Id.* at 24–26. The Commissioner rejects plaintiff's argument that the ALJ was required to provide a better articulation of his findings in these areas of functioning, citing *Keene v. Berryhill*, which found no requirement that the ALJ provide an "exhaustive point-by-point breakdown of each and every listed impairment." *Id.* at 26 (quoting 732 F. Appx. 174, 177 (4th Cir. 2018)). Instead, the Commissioner asserts the *Keene* court found the ALJ was only required to provide a "coherent basis" for his determination, and that the ALJ's decision should be read "as a whole." *Id.* (quoting 732 F. Appx. at 177 (upholding the ALJ's conclusion regarding these listings based on the ALJ's findings at subsequent steps in the analysis)).

31

Plaintiff does not address *Keene* in his reply.  However, plaintiff does once again assert that "[n]owhere does the ALJ connect the various activities or behaviors he lists to an explanation of how they equate with a moderate impairment. . . or how they can be differentiated from a marked impairment."  (Docket no. 22 at 9).

### iii.    Step Three Legal Standard

At the third step of the five-step sequential evaluation, the ALJ considers the medical severity of a claimant's impairments to determine if the claimant has an impairment that meets or equals one of the SSA's "listings," and meets the duration requirement; if the duration and listing are met, the claimant will be found disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  To determine the severity of mental impairments, the ALJ must follow a "special technique" as set forth in the regulations.  20 C.F.R. § 404.1520a.  First, the ALJ evaluates the claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [the claimant] ha[s] a medically determinable mental impairment(s)."  20 C.F.R. § 404.1520a(b)(1).  Second, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)."  20 C.F.R. § 404.1520a(b)(2).  The SSA has identified four broad functional areas (paragraph B criteria) in which the ALJ rates a claimant's degree of functional limitation: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  20 C.F.R. § 404.1520a(c)(3).  The ALJ assesses the degree of limitation using a five-point scale: none, mild, moderate, marked, or extreme.  20 C.F.R. § 404.1520a(c)(4).  The ALJ will compare the medical findings regarding the claimant's impairments and the rating of the degree of functional limitation to the criteria of the "appropriate listed medical disorder."  20 C.F.R. § 404.1520a(d)(2).  For each of the listed medical disorders the ALJ compared with plaintiff's mental impairments (20 C.F.R. Part 404,

subpt. P, app. 1, §§ 12.03, 12.04, 12.05), plaintiff would have had to have an extreme limitation

in one, or a marked limitation in two, of the four areas in the paragraph B criteria.  20 C.F.R. Part

404, subpt. P, app. 1, §§ 12.03B, 12.04B, 12.05B.

> iv.   *Read as a Whole, the ALJ Provides a Coherent Basis for His*
> *Determinations at Step Three regarding the Paragraph B Criteria, and*
> *those Determinations are Supported by Substantial Evidence*

The *Keene* court found on *de novo* review of the district court's opinion that although the

ALJ must discuss the evidence he found credible and why, and specifically apply the pertinent

legal requirements to the medical record, the ALJ is not required to provide an "exhaustive point-

by-point breakdown of each and every listed impairment." 732 Fed. Appx. at 177.  Instead,

reading the opinion as a whole, the ALJ need only provide a coherent basis in his decision for his

step-three determination, and the ALJ's step-three determination may be upheld based on his

findings at subsequent steps in the analysis.  *Id.* (citing *Fischer-Ross v. Barnhart*, 431 F.3d 729,

734 (10th Cir. 2005)); *see also Smith v. Astrue*, 457 Fed. Appx. 326, 328 (4th Cir. 2011) (finding

substantial evidence supports the ALJ's finding at step three based on his analysis at other steps

in his decision).

Unlike the restrictive approach used in the Tenth Circuit, [13] the Third, Sixth, Seventh, and

Ninth Circuits all use the Fourth Circuit's approach in *Keene* of treating the ALJ's discussion of

the evidence and findings anywhere in the decision as a potential basis for upholding the ALJ's

determinations at step three without penalty for not having included the supportive discussion

and/or finding(s) in the step-three determination.  *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5

---

[13] The *Fischer-Ross* court held that the ALJ erred in failing at step-three to sufficiently
justify his determination, but found that error harmless because "no reasonable factfinder could
conclude otherwise" than that the ALJ's confirmed findings (*i.e.* findings at later steps of the
analysis upheld by the district court) and objective medical evidence precluded plaintiff's
impairments from meeting the relevant listing.  431 F.3d at 733–35.

(7th Cir. 2004) (finding substantial evidence supports the ALJ's finding at step three based on his analysis at other steps in his decision); *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (same); *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411 (6th Cir. 2006) (same); *cf. Lewis v. Apfel*, 236 F.3d 503, 513 (9th Cir. 2001) (same based on the evidence discussed in the ALJ's "Statement of the Case," although that evidence was not recited in his "Findings"). In *Keene*, although the justification was "sparse," it was sufficient to determine the ALJ performed an adequate review of the record and the decision was supported by substantial evidence. 732 Fed. Appx. at 177 (leaving the resolution of conflicts in the evidence to the ALJ).

Plaintiff argues that the ALJ's step-three determination was not supported by substantial evidence because the listing of activities without discussion of the extent to which plaintiff could engage in them was error and also that the evidence provided in support of the ALJ's determination at step three included irrelevant activities or activities that do not support the ALJ's step-three determinations without further explanation. Considering the caselaw, the only question is whether, reading the ALJ's decision as a whole, the step-three determinations are supported by substantial evidence (because if they are supported by substantial evidence there would be coherent bases). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1979)).

At step three, the ALJ first described the legal standard, noting that an extreme impairment signified the inability to function independently, appropriately, or effectively, and on a sustained basis, while a marked impairment signified a seriously limited ability to function in that regard. (AR 18). In his step-three determinations, the ALJ noted many of the daily activities plaintiff was able to engage in. (AR 18–19). Regarding plaintiff's challenge that the

34

ALJ failed to discuss the extent to which plaintiff engaged in these activities, the ALJ listed "[plaintiff]'s *daily activities* . . . activities of *daily living*." (AR 23) (emphasis added).

The ALJ found plaintiff had a moderate limitation in the ability to understand, remember and apply information. (AR 18). The ALJ noted that in plaintiff's mental status checks he was repeatedly found: to be alert and oriented; to have good attention, concentration, insight, and judgment; and to have organized speech. (AR 19). These mental status checks show no indication of a serious limitation in the ability to remember, understand, or apply information. Furthermore, the ALJ noted plaintiff took care of his young minor children; remembered that his house had 25 steps because he had just vacuumed them; ran errands, paid bills, managed a savings account and checkbook; could count change and drive; and transported his children to various locations, among other things. (AR 18–19). Plaintiff's ability to engage in these daily activities indicates a lack of a serious limitation.

The ALJ found plaintiff had the residual functional capacity to understand, remember, and carry out simple instructions and make simple work-related decisions; and that plaintiff was limited to positions that required "very little independent decision making with no responsibility for the safety of others." (AR 20). The ALJ recounted much of the medical evidence after plaintiff's alleged onset date, as well as plaintiff's subjective statements regarding the effects of his impairments. (AR 21–23). None of plaintiff's subjective complaints indicated a serious limitation in his ability to understand, remember, or apply information. The ALJ nonetheless explicitly rejected the state agency psychologists' determinations that plaintiff could understand, remember, and carry out detailed instructions, finding the record showed otherwise. (AR 24). The ALJ found their opinions only partly persuasive in finding plaintiff was limited to simple instructions. *Id.* The ALJ also noted that the state agency consultants found plaintiff could make

simple work-related decisions, which the ALJ found consistent with the record. *Id.* Given plaintiff's positive mental status exams, his ability to engage in the listed daily activities, the state agency psychologists' and ALJ's findings, and the lack of any significant evidence to the contrary, the ALJ's determination that plaintiff had only a moderate limitation in the ability to understand, remember, and apply information is supported by substantial evidence.

The ALJ found plaintiff had a moderate limitation in the ability to interact with others. (AR 19). The ALJ noted plaintiff lived with his wife and two children, shopped and ran errands, rode in cars with others, used a cellphone to communicate with others including by text, and transported his minor children, among other things. *Id.* All activities requiring interaction with others. The ALJ also noted that in his mental status checks plaintiff was repeatedly found to be alert and oriented; cooperative and friendly; to have a euthymic affect; to make good eye contact; to have good attention; and to have organized speech. *Id.* These repeated checks reveal plaintiff was able to interact well with his doctors, at least for the time necessary to conduct an appointment. The ALJ found plaintiff had the residual functional capacity to tolerate occasional interaction with coworkers and supervisors but needed to avoid contact with the public and tandem work tasks. (AR 20). The ALJ noted plaintiff testified that his impairments affected his ability to get along with others, but found the intensity, persistence, and limiting effects of plaintiff's alleged symptoms not consistent with plaintiff's daily activities and objective medical evidence, limiting the persuasiveness of plaintiff's subjective complaints. (AR 22–23).

The ALJ also addressed the state agency psychologists' opinions, concurring that plaintiff could ask questions or request assistance, could maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and could get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but also finding plaintiff

36

further limited in his ability to interact with the public. (AR 24–25). The ALJ adequately addressed plaintiff's subjective complaints regarding his ability to interact with others, but found based on plaintiff's daily activities, mental status checks, and other behavior, as well as the state agency psychologists' opinions, that plaintiff was only moderately limited. A reasonable mind could accept this evidence as adequate to support the conclusion that plaintiff was only moderately impaired in his ability to interact with others, therefore that determination was supported by substantial evidence.

The ALJ found plaintiff was moderately limited in concentrating, persisting, and maintaining pace. (AR 19). The ALJ noted plaintiff was able to watch the news and other television, follow politics, drive, run errands, shop by computer, pay bills, count change, manage a savings account and checkbook, and transport his minor children to various locations, among other things. *Id.* The ALJ also noted that plaintiff indicated he could follow both written and oral instructions well, and in his mental status checks he was repeatedly found to be alert and oriented, to have good attention, concentration, insight, and judgment, and that his speech was organized. *Id.* These activities indicate plaintiff had the ability to concentrate in watching television and the news, and following politics, as well as in managing a savings account and checkbook, paying bills, counting change, driving, and shopping by computer. They also indicate plaintiff could persist or maintain pace in transporting his children to various locations and running errands. Plaintiff's ability to follow written and oral instructions well indicate both that he was able to concentrate on the instructions in receiving them and carrying them out, as well as persisting and maintaining pace in carrying them out.

The ALJ noted that plaintiff stated his mental impairments affected his ability to concentrate, but found the intensity, persistence, and limiting effects of plaintiff's alleged

symptoms not consistent with plaintiff's daily activities and objective medical evidence, limiting the persuasiveness of plaintiff's subjective complaints. (AR 22–23). The ALJ found plaintiff had the residual functional capacity to work at a consistent pace throughout the workday, but not at a production rate pace where tasks must be performed quickly. (AR 20). The ALJ concurred with the state agency psychologists that plaintiff could sustain an ordinary routine without special supervision, could carry out short and simple instructions (though he found plaintiff could not carry out detailed instructions), could make simple work-related decisions, and could work in coordination with or proximity to others and not be distracted by them. (AR 20, 24). The first state agency psychologist, Julie Jennings, found plaintiff moderately limited in this category, noting that plaintiff was sometimes noncompliant with his medication and heard voices therefore plaintiff would need more unscheduled breaks than the average employee but not to such an extent that would preclude competitive employment. (AR 90, 94). Similarly, as discussed above, Dr. McClain concurred that plaintiff was moderately limited in this category, noting plaintiff would be able to maintain concentration and attention for two-hour periods to complete an eight-hour day, and would be able to complete a normal work week and perform at a generally consistent pace with others, with only a minimal need for accommodations on an infrequent basis. (AR 108–09, 113). The ALJ accounts for these limitations in finding that plaintiff could not complete tasks at a production rate pace where they must be performed quickly. (AR 20). Read as a whole, despite plaintiff's subjective complaints, the ALJ provided an adequate basis for his determination that plaintiff was only moderately limited in concentrating, persisting, and maintaining pace, therefore his determination that plaintiff was only moderately limited in this regard was supported by substantial evidence.

38

The ALJ found that plaintiff had, at most, a moderate limitation in adapting or managing oneself. (AR 19). The ALJ noted that plaintiff could care for all his personal needs, and that he was a primary caregiver for young minor children. (AR 19–20). The ALJ also noted that plaintiff used a cell phone and texted with others, shopped in stores, and had a driver's license and drove. (AR 20). The ALJ acknowledged that plaintiff stated he could go a week without showering when he was off his medications, but that he did shower regularly when he was on his medications although he was still not himself. (AR 23). The ALJ also acknowledged that plaintiff stated even when he took his medications, he would feel hopeless for up to nine days each month. *Id.* The ALJ, however, found that plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not consistent with plaintiff's daily activities and the objective medical evidence, lessening the persuasiveness of plaintiff's subjective complaints. (AR 22–23). The state agency psychologists found plaintiff was not limited in this category, but the ALJ found those portions of their opinions only partly persuasive, concurring that plaintiff could sustain an ordinary routine without special supervision, and adhere to basic standards of neatness and cleanliness. (AR 24). The ALJ found plaintiff had the residual functional capacity to tolerate occasional changes in routine work settings and procedures or processes. (AR 20). Reading the decision as a whole, a reasonable mind could find the evidence adequate that plaintiff was only moderately limited in this regard, therefore the ALJ's determination was supported by substantial evidence.

Reading the decision as a whole, substantial evidence supported the ALJ's determination that plaintiff was only moderately limited in all four paragraph B criteria categories. Therefore, the ALJ provided coherent bases for his determinations at step three, and his determination that plaintiff's mental health did not constitute an impairment or combination of impairments that

meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 was supported by substantial evidence.

## V. CONCLUSION

Based on the foregoing, the Commissioner's final decision denying benefits for the period of February 4, 2019 through the date of the ALJ's decision on April 17, 2020 is supported by substantial evidence, and the proper legal standards were applied in evaluating the evidence. Accordingly, plaintiff's motion for summary judgment (Docket no. 15) will be denied; the Commissioner's motion for summary judgment (Docket no. 18) will be granted; and the final decision of the Commissioner will be affirmed.

Entered this 31st day of March, 2021.

_____/s/_____
John F. Anderson
United States Magistrate Judge

Alexandria, Virginia